AUSA Catherine Dick, Asst. Chief    (202) 538-4049
Special Agent Brian Fairweather, FBI    (313) 590-4794

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District c ...

United States of America

v.

FARID FATA

Case: 2:13-mj-30484
Judge: Unassigned,
Filed: 08-06-2013 At 10:56 AM
CMP: USA v FATA (FMM)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 2009 to present _____ in the county of _____ OAKLAND _____ in the _____ Eastern _____ District of _____ Michigan _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1347 | Health Care Fraud |

This criminal complaint is based on these facts:
PLEASE SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Brian Fairweather, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _August 6, 2013_

_____
*Judge's signature*

City and state: _Detroit, Michigan_

Honorable David R. Grand U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT IN SUPPORT OF COMPLAINT**

The undersigned, Brian Fairweather, being first duly sworn, hereby deposes and states as follows:

### **Affiant's Background and Qualifications**

1. I, Brian Fairweather, hereinafter referred to as the Affiant, am a Special Agent employed by Federal Bureau of Investigation ("FBI"), United States Department of Justice. I have been so employed since May 2010 and am currently assigned to the Detroit Field Office of the FBI. Since becoming a Special Agent with the FBI, my duties and responsibilities have included conducting criminal investigations of individuals, organizations, and businesses that have violated federal laws, including those laws found in 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 287 (False, Fictitious, or Fraudulent Claims), 21 U.S.C. § 841(a)(1) (Distribution of Controlled Substances), 18 U.S.C. §§ 1956, 1957 (Money Laundering), 42 U.S.C. §§ 1320a-7(b)(1)(A) and 1320a-7(b)(2)(A) (Payment or Receipt of Health Care Kickbacks).

2. I have knowledge of the facts set forth in this Affidavit as a result of my participation in the investigation as well as information provided to me by other law enforcement agents involved in this investigation and others. Since this Affidavit is being submitted for the limited purpose of supporting a complaint, I have not included each and every fact known to me concerning this investigation.

3. I, with the assistance of other FBI agents and agents from the Department of Health and Human Services-Office of Inspector General (HHS-OIG), have

investigated a health care fraud scheme involving Dr. FARID FATA, the defendant.

4. Dr. Fata has systematically defrauded Medicare by submitting false claims for services that were medically unnecessary, including chemotherapy treatments, Positron Emission Tomograph (PET) scans and a variety of cancer and hematology treatments for patients who did not need them. In the course of the scheme, Dr. Fata has falsified and directed others to falsify documents.

5. Specifically, Dr. Fata has directed the following activities:

   a. Administration of unnecessary chemotherapy to patients in remission

   b. Deliberate misdiagnosis of patients as having cancer to justify unnecessary cancer treatment

   c. Administration of chemotherapy to end-of-life patients who will not benefit from the treatment

   d. Deliberate misdiagnosis of patients without cancer to justify expensive testing

   e. Fabrication of other diagnoses such as anemia and fatigue to justify unnecessary hematology treatments

   f. Distribution of controlled substances to patients without medical necessity

6. Based on the information set forth below, I have probable cause to believe and do believe that the defendant has violated 18 U.S.C. § 1347, Health Care Fraud.

**The Medicare Program**

7.  The Medicare Program ("Medicare") is a federally-funded health care program providing benefits to persons who are over the age of sixty-five or disabled. Medicare is administered by CMS, a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

8.  Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

9.  Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

10. This investigation primarily relates to physician services covered under Medicare Part B.

11. Medicare pays only for those services that are both medically necessary and actually rendered.

**Current Procedural Terminology Codes**

12. The American Medical Association assigns and publishes numeric codes, known as the Current Procedural Terminology ("CPT") and Health Care Procedure Common Coding System ("HCPCS") codes. The codes are a

systematic listing, or universal language, used to describe the procedures and services performed by health care providers.

13. According to documents filed with the State of Michigan Department of Labor and Economic Growth (DELEG), Dr. Farid Fata incorporated MHO on or about April 11, 2005. Annual reports submitted by Dr. Fata to the State of Michigan Department of Licensing and Regulatory Affairs (LARA) list the current business address of MHO as 1901 Star-Batt Drive, Suite 200, Rochester Hills, Michigan. Dr. Fata is listed as the President, Secretary, Treasurer, and Vice President of MHO.

14.     The registered web site of MHO, www.michigancancercenter.com, lists six additional office locations: 5680 Bow Pointe Drive, Ste 201, Clarkston, MI; 2520 S. Telegraph Road, Ste 107, Bloomfield Hills, MI; 944 Baldwin Road, Ste G, Lapeer, MI; 37450 Dequindre Road, Sterling Heights, MI; 2891 E. Maple, Ste 102, Troy, MI; 15300 W. 9 Mile Road, Oak Park, MI.

15.     MHO holds a Medicare provider identification number ("PIN"). Medicare billing records reflect that MHO receives funds through under which it bills Medicare. Medicare pays MHO via an electronic funds transfer agreement ("EFT") into a Huntington Bank account.

16.     Your affiant and other agents interviewed eight former and current employees of MHO in August 2013. According to multiple employees, Dr. Fata works at multiple MHO locations. On Monday, Wednesday and Friday, Fata works at the Rochester location all day. On Tuesday he works

at the Bloomfield Hills office for half the day and then goes to the Clarkston office for the second half of the day.  On Thursday Dr. Fata works at the Clarkston location all day.

**United Diagnostics PLLC**

17.     According to Articles of Organization filed with LARA, Dr. Farid Fata incorporated United Diagnostics PLLC on or about November 1, 2012.  The Articles listed Dr. Fata as the Organizer and Resident Agent at the registered office, which was listed as 1901 Star-Batt Drive, Suite 200, Rochester Hills, Michigan. According to the filing, the company was organized for the sole and specific purpose of rendering "diagnostic services provided by a licensed physician."

18.     A current employee (EE-1) with personal knowledge of the business practices at MHO informed your affiant that United had moved offices from 1901 Star-Batt Drive to 1688 Star-Batt Drive, Rochester Hills, Michigan.  He further advised on August 2, 2013 that all PET scans ordered for MHO patients were conducted at this United location and records of these scans were maintained there. A subsequent open source records search in Lexis-Nexis also indicated that the new United Diagnostics address was 1688 Star-Batt Drive, Rochester Hills, Michigan.

**Vital Pharmacare LLC**

19.     According to Articles of Organization filed with LARA,  MHO Pharmacy Services LLC was formed on or about December 26, 2012. Dr.

Farid Fata was listed as the registered agent and the registered office was listed as 1901 Star-Batt Drive, Suite 200, Rochester Hills, Michigan. On the same day, a certificate of assumed name was filed with LARA listing the assumed name Michigan Hematology Oncology Pharmacy Services. A second certificate of assumed name was filed with LARA on February 15, 2013 and listed the assumed name Hope Specialty Pharmacy. Six days later, on February 21, 2013, the Articles of Organization were amended; documents filed with LARA changed the official corporate name to Vital Pharmacare LLC. On the same day, another certificate of assumed name was filed with LARA listing the assumed name MHO Pharmacy Services.

20.    An open source records search in Lexis-Nexis indicated that Vital was assigned an active DEA registration number FV3733258 and was located at 1901 Star-Batt Drive, Suite 200, Rochester Hills, Michigan.

**Residence of Farid Fata**

21.    Public records checks performed by agents have shown that Farid Fata currently resides at 2677 Forest Glen Court, Oakland Charter Township, Michigan.  Additionally, on the 2013 annual report for MHO filed with LARA on May 31, 2013. Dr. Fata lists his home address as 2677 Forest Glen Court, Oakland Charter Township, Michigan.

22. During an interview conducted on August 2, 2013, EE-1 informed your affiant that Dr. Fata routinely brings MHO patient charts and billing records to his home at night.  The employee has both seen Dr. Fata leave the office in the evening with "bags of billing sheets and patient records", and has been

told by Dr. Fata's wife that Dr. Fata maintains MHO patient files in their home.

## **Facts Supporting Allegations**

23.  A current employee/doctor, who is an oncologist, EE-2, was interviewed by Agents from HHS-OIG and the FBI on August 5, 2013.  EE-2 worked for DR. FATA for more than 18 months.  Dr. Fata determined the diagnosis and course of treatment for all patients.  EE-2 described his work for Dr. Fata as "living with this hell."

24.  EE-2 states that Dr. Fata gives cancer drugs to patients where it is medically unnecessary or in inappropriate dosages.

25. In the case of one patient, M.F., EE-2 discovered that Dr. Fata was ordering Velcade, a chemotherapy treatment even though M.F.'s cancer was inactive. EE-2 told the patient that she should find a second opinion and not return to MHO.  M.F. never came back to MHO.

26. As another example, EE-2 stated a normal onocologist might prescribe Rituximab, a monoclonal antibody, for a non-Hodgkins lymphoma patient in the amount of 12 doses over 2 years.  Dr. Fata will order 56 doses in two years.  This is an inappropriate amount of the drug.

27. According to EE-2, Dr. Fata orders chemotherapy for all end-of-life patients. He states no other physician would do this and would let the patient die in peace.

28. Another form of fraud that EE-2 noted relates to of Intravenous Immunoglobulin (IV/IG) therapy. According to EE-2, only patients with low IgG (an antibody) levels should receive IV/IG. 99% of MHO's patients get IV/IG, despite the fact that they do not have low IgG levels.

29. A MHO nurse practitioner reported to EE-2 a conversation she had with an infusion nurse that IV/IG should not be ordered where there was not a low IgG level. The nurse then reviewed a set of patient files for patients who had received IV/IG and took some of them to EE-2 to say that these patients did not have the necessary low IgG. EE-2 told her that he knew that.

30. In the alternative, IV/IG can be administered in the short term – over a period of a few months – for recurrent infections. EE-2 states that Dr. Fata orders the IV/IG treatment for life.

31. EE-2 further described how Dr. Fata keeps patients on unnecessary treatments with respect to a condition known as Idiopathic Thrombocytopenic Purpura (ITP). ITP is a low platelet condition. The long term solution to ITP can be the removal of the patient's spleen. In the interim period, typically 5-6 weeks before surgery, the drug Rituximab, a monoclonal antibody, can be given as a bridge treatment. According to EE-2, Dr. Fata does not tell patients about the long term solution of spleen removal and simply continues them on Rituximab indefinitely, and for years at a time.

32. EE-2 states that the cancer drugs being ordered and administered unnecessarily by Dr. Fata are toxic, can cause variations in the immune

system and can lead to death. He believes they are being administered at dangerous levels.

33. EE-3 was interviewed by Agents from the FBI and HHS-OIG on August 5, 2013. EE-3 is a nurse practitioner who has been employed by MHO for approximately two and a half years. She works at MHO's Clarkston location. EE-3 is involved in infusions and injections at the Clarkston location.

34. Recently, EE-3 realized that Dr. Fata is ordering IV/IG treatments for patients who do not need them. Based on her prior clinical experience, EE-3 found it strange that IV/IG was being administered at a high volume at MHO, which is an office and not a hospital setting. When EE-3 was a nurse at Beaumont Hospital working for approximately 8 doctors with a larger patient population than Dr. Fata's, she saw approximately 2-3 patients per month coming in for IV/IG. By contrast, EE-3 estimated that she saw 50 patients per month coming to the Clarkston MHO location for IV/IG treatment.

35. IV/IGs are only appropriate for patients with low IgG levels or recurrent infections. EE-3 pulled 40 patient files for patients who were scheduled to receive these treatments and discovered 38 of the patients did not need IV/IG treatment.

36. EE-3 took this issue up with another nurse practitioner and the infusion therapy manager. The employees agreed to discharge the 38 patients whose condition did not justify the IV/IG treatment.

37. EE-3estimates that Dr. Fata orders chemotherapy for 60-70% of oncology patients who are near the end of their lives. EE-3 states that they are not being allowed to have their last days in comfort and are being given very high doses of chemotherapy.

38. EE-3 states that because of Dr. Fata's large patient volume, possibly around 50-70 patients per day, Dr. Fata has foreign doctors perform most of the actual examination. EE-3 refers to these individuals as "interns" and does not know if they have license. Dr. Fata sees the patients only for 2-3 minutes. The patients frequently complain about it.

39. EE-3 has discussed her concerns about Dr. Fata ordering unnecessary IV/IG treatments and inappropriate chemotherapy in dying patients with EE-2. EE-2 told her he was leaving MHO because of this and that she should watch her back.

40. EE-4 was interviewed by Agents from the FBI on August 5, 2013. EE-4 is a nurse practitioner who began work for MHO in June 2009. She works primarily at the Rochester Hills MHO location, but also travels to other locations with Dr. Fata.

41. According to EE-4, Dr. Fata orders cancer treatment for patients who do not require it. EE-4 specifically recalls two patients who went into remission, but Dr. Fata ordered that they continue on a "maintenance dose" of chemotherapy. These two patients sought second opinions and were told the chemotherapy treatment was inappropriate. They left the practice thereafter.

42. In addition, Dr. Fata falsifies cancer diagnoses to justify cancer treatments. Where a test falls in a "grey" area, he will diagnose cancer in order to start cancer treatment. EE-4 explains that it is easier for the doctor to do this for blood cancers where the doctor has more discretion to interpret blood test results vs. tumors, for which it is harder to falsify diagnoses.

43. Dr. Fata has directed EE-4 to falsify cancer diagnoses to justify PET scans performed by his company where the patient did not have cancer. Patients are not given their false diagnosis; it is written in the chart purely to justify the fraudulent billing to the insurance company.

44. An MHO biller also asked EE-4 to add a fatigue diagnosis for patients who did not have fatigue.

45. Dr. Fata also directed EE-4 to falsify records to justify the administration of IV/IG treatment. Specifically, IV/IG is covered where there is a history of recurring infections, which Dr. Fata would tell EE-4 to document in the file of patients who had not had recurrent infections.

46. In two instances, Dr. Fata directed that chemotherapy be administered to patients who had other serious medical conditions that required immediate treatment before he would permit them to go to the hospital.

47. In one instance, a male patient fell down and hit his head when he came to MHO. Dr. Fata directed EE-4 that he must receive his chemotherapy before he could be taken to the emergency room. MHO administered the

chemotherapy, after which the patient was taken to the emergency room. The patient later died from his head injury.

48. In the second instance, a patient came to MHO with extremely low sodium levels, which can be fatal. Dr. Fata again directed that the patient must first receive chemotherapy before being taken to the emergency room. MHO administered the chemotherapy and the patient was taken to the emergency room and hospitalized.

49. EE-4 stated that Dr. Fata sees 50-70 patients per day. She states that he bills every patient at the highest possible code, even though he spends only 3-5 minutes with each patient.

50. EE-5 was interviewed by Agents from the FBI and HHS-OIG on August 5, 2013. EE-5 was hired in approximately July or August of 2012 as a Medical Assistant for MHO at the Clarkston and Rochester Hill locations. She worked as both an assistant for Dr. Fata as well as working on insurance authorizations for MHO. She quit in May 2013.

51. EE-5 quit MHO in May 2013 due to Dr. Fata's conduct related to a radiology center that he opened. Specifically, EE-5 stated that Dr. Fata ordered her falsify records in order to justify PET scans. Dr. Fata told her to place cancer diagnoses in patients' records to justify the exams, even though the patients did not have cancer. While Dr. Fata was in the process of opening his radiology center, he deliberately delayed ordering PET scans for patients who needed them so that he could provide them through his own

center. Dr. Fata would become angry and yell at staff if they were not correctly documenting the files to justify PET scans.

52. EE-5believes Dr. Fata ordered chemotherapy for patients who did not need it. Specifically, she believes that "maintenance chemotherapy" was ordered for patients who did not need it. EE-5 said that Dr. Fata would tell patients that once they had chemotherapy, they had to have it for the rest of their lives.

53. EE-5 stated that Dr. Fata directed her and other medical assistants that every patient had to have a chief complaint noted in the file for which Dr. Fata could justify certain tests and/or medications. Frequently, EE-5 and other medical assistants would mark "fatigue" or "anemia" to justify tests for patients who did not have either condition.

54. If patients expressed nervousness to Dr. Fata about their treatment, Dr. Fata would prescribe them Xanax to calm them down. Xanax (alprazolam) is a Schedule IV controlled substance.

55. EE-5's mother was treated by Dr. Fata for low platelet count. Dr. Fata's office manager would give EE-5 tasks to do during her mother's treatment so that EE-5 was not present for the visits. Dr. Fata ordered a cancer treatment drug, Rituxan, for EE-5's mother. A nurse practitioner informed EE-5 that the appropriate course of treatment was steroid therapy, not cancer treatment drugs. When EE-5 confronted Dr. Fata, he said that steroid therapy would cause her mother to gain weight. Dr. Fata prescribed EE-5's mother Xanax, which EE-5 told her mother not to take.

56. EE-5 reports that Dr. Fata performed bone marrow biopsies in an unsterile setting at hospitals and at the MHO clinics. Specifically, medical assistants use ungloved hands to handle gauze and other materials used in the procedure.

57. EE-5 reports that Dr. Fata ordered unlicensed medical assistants to give unnecessary injections. Specifically, Dr. Fata ordered unlicensed medical assistants to inject patients with Procrit, a hemoglobin booster shot even when the testing did not show a low hemoglobin count.

58. EE-5 reports that MHO's recordkeeping is so poor that patients frequently receive the wrong medicines or medicines out of sequence. In one instance, EE-5 mistakenly injected a patient with a short term high dosage drug because she was not aware he had received a longer term injection treatment the day before.

59. Dr. Fata writes prescriptions for oxycontin (oxycodone), but gives medical assistants the discretion to decide if patient should receive them. Oxycodone is a Schedule II controlled substance.

60. EE-5 reports that Dr. Fata has approximately 50 patients per day. He employed three foreign doctors who were not licensed in the United States to examine the patients and provide an initial diagnosis. Dr. Fata would then come in for typically five minutes.

61. EE-1 was interviewed by agents from the FBI and HHS-OIG on August 2, 2013. He is currently employed by MHO in a business capacity.

62. EE-1 informed your affiant that Vital is owned by Dr. Fata. He further advised that Dr. Fata instructed all MHO employees that Vital was the only pharmacy they were permitted to use to obtain oral chemotherapy drugs. This instruction was documented in an email from Dr. Fata to all MHO employees.

63. The PET scan equipment used for MHO patients is operated by United Diagnostic, which is owned by Dr. Fata.

64. EE-1 advised that all patients referred to MHO, even those referred only for hematology issues, are prescribed PET scans and blood tests. EE-1 advised that two MHO medical assistants questioned him about the practice of giving all patients PET scans, even those referred only for anemia or other hematology issues.

65. Medical assistants at MHO fielded numerous complaints from patients saying their insurance providers were not covering PET scans because they were not medically necessary. As a result, MHO medical assistants told EE-1 that they were personally pressured by Dr. Fata to fabricate cancer diagnoses in patient records so insurance carriers would fully reimburse the cost of PET scans.

66. Approximately eight to nine months ago, EE-2 raised an objection to a MHO patient in the Lapeer office having chemotherapy with no doctor present because the patient experienced an adverse reaction to the chemotherapy. The reaction resulted in emergency services being called to the office and the patient taken by ambulance to a nearby hospital. EE-2 told EE-1 that it was a common practice at MHO for patients to receive chemotherapy with no doctors present. EE-1 stated that licensed doctors

currently oversee the chemotherapy, but that this was a recent improvement and had not always been the case.

67. EE-1 stated that foreign doctors "just show up" at MHO. These foreign doctors – who do not have a license to practice medicine in the United States – introduce themselves to patients as "Doctor".

68. The unlicensed doctors are generally assigned to examine Dr. Fata's patients and complete write-ups of their exam. Dr. Fata typically sees his patients for only a few minutes at the end of their typical 2-4 hour visit to the clinic. The rest of the patients' time is spent with the unlicensed doctors and other MHO staff. This arrangement allows Fata to routinely see between 50-70 patients per day while other doctors in his practice see between five and ten.

69. EE-1 stated that on multiple occasions he had conversations with staff members about ongoing unethical practices at the MHO clinic. EE-1 advised that several of these staff members were no longer working at the clinic because of these practices.

70. EE-2 explained to EE-1 that MHO had been reimbursed for the improper administration of Intravenous Immunoglobulin (IV/IG). Other drugs EE-2 said were being prescribed improperly were Gammagard and Octagam.

71. A MHO physician spoke with EE-1 approximately six months ago and observed that Dr. Fata sees an inordinately high number of patients; he also

noted that Fata prescribes chemotherapy to patients who do not medically require it.

72. EE-6 was interviewed by Agents from the FBI and HHS-OIG on August 5, 2013.   EE-6 is a Nurse Practitioner who currently works for MHO.

73. According to EE-6, 70-80% of MHO patients receive PET scans.   EE-6 noted that they received these scans even if it was not indicated for their condition.   For example, she observed a patient coming to Rochester location of MHO on August 5, 2013 for a follow-up after a PET scan for breast cancer, which is not indicated.

74. EE-6 was aware of Dr. Fata administering unnecessary chemotherapy treatment.   Specifically, EE-6 states a female patient was placed on "maintenance" chemotherapy by Dr. Fata even after her lung cancer was resolved.   EE-6 stated that the patient got a second opinion from another doctor who told her that she did not need further chemotherapy treatment, after which the patient left the MHO practice.   This occurred around June or July of this year.

75. At other times, EE-6 was aware that Dr. Fata ordered the administration of Octagam – an IV/IG drug – where IgG levels were normal.   Octagam should only be administered for low IgG levels or if there have been recurrent infections.

76. When EE-6 told EE-2 she was leaving MHO, he said she made a wise decision. EE-2 told her to make sure her malpractice insurance is kept up. He stated that if one of them went down, all would go down.

77. EE-6 has seen Dr. Fata prescribe intravenous iron for patients who are not iron deficient. This is not an appropriate course of treatment.

78. After EE-6 writes up courses of treatment for patients, Dr. Fata frequently adds treatments. EE-6 would sometimes consult the National Cancer Center Network guidelines and discovered the treatments he added were not indicated.

79. Dr. Fata typically sees 30-60 patients in a single day. Because of the volume of patients, unlicensed doctors and nurse practitioners divide up his patient load, examine the patients, and create courses of treatment. Dr. Fata sees the patients only for a cursory exam and often changes the course of treatment. EE-6 believes he then bills the two highest level office visit codes under his own number.

80. EE-7 was interviewed by Agents from the FBI and HHS-OIG on August 5, 2013. EE-7 reports that she began working on July 5, 2012 for MHO. She currently works as a Receptionist and Medical Assistant.

81. According to EE-7, Dr. Fata opened a company known as United Diagnostics to perform medical testing. Since he opened United Diagnostics the percentage of patients in his practice receiving PET scans she estimates has increased from 30% to 70%.

82. In addition, Dr. Fata owns a pharmacy run by an individual named "Steve." Dr. Fata directed that EE-7order all oral chemotherapy drugs through his pharmacy. At times, that pharmacy was unable to provide the drug on the same day so EE-7 wanted to order from a different pharmacy. She believed Dr. Fata was unhappy when EE-7 ordered through a different pharmacy.

83. EE-7 noted that patients admitted for treatment for anemia were receiving initial PET scans. EE-7 states a PET scan is used to detect cancer.

84. EE-7 became aware of inappropriate medical billing at MHO. Specifically, it is inappropriate to bill an office visit with chemotherapy on the same day. EE-7 addressed this with the MHO biller, who stated that he knows he is not supposed to bill it this way but does it anyhow.

**Medicare Billing**

85. According to EE-1, approximately 78% of MHO's practice is based on Medicare billing.

86. Medicare billing data confirms that MHO has billed approximately $35 million over two years, approximately $25 million of which was billed by Dr. Fata.

87. Dr. Fata is responsible for approximately $24.3 million in drug infusions that he billed directly to Medicare, more than any other hematologist/oncologist in the State of Michigan during that time period.

88. The same data confirms that MHO billed Medicare for various infusion and injection medications, including Rituximab, Octagam (IV/IG), and iron supplements.

89. Based on the foregoing, there is probable cause to believe that DR. FARID FATA, the defendant, has committed violations of 18 U.S.C. § 1347 (Health Care Fraud).

_____
Brian Fairweather, Special Agent
Federal Bureau of Investigation
United States Department of Justice


Sworn to and subscribed to before me this 6th day of August, 2013.

_____
Hon. DAVID R. GRAND
United States Magistrate Judge
Detroit, Michigan